IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LARRY WALKUP and<br>BETTY WALKUP, | ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | |
| v. | ) | Civil Action No. 12-1635-SLR-SRF |
| | ) | |
| AIR & LIQUID SYSTEMS CORP.,<br>AKA BUFFALO PUMPS, INC., et al., | ) <br> ) <br> ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Presently before the court in this diversity action is a Motion to Remand filed by the Plaintiffs, Larry and Betty Walkup ("Plaintiffs"), on the ground that the removing party, Defendant Foster Wheeler Energy Corporation ("Foster Wheeler"), did not meet the requirements for removal under 28 U.S.C. § 1442. (D.I. 13) Foster Wheeler opposes Plaintiffs' Motion. (D.I. 20) For the reasons which follow, I recommend that the court DENY Plaintiffs' Motion to Remand.

### II. BACKGROUND

The Plaintiffs filed this personal injury action against Foster Wheeler and other defendants on June 14, 2012, in the Superior Court of Delaware. (D.I. 1, Ex. A) The Complaint alleges that Larry Walkup ("Mr. Walkup") was exposed to asbestos through personal construction work from 1954 to 1959, personal automotive work from 1958 to 1980, and employment as an engineman in the U.S. Navy from 1959 to 1962, as a laborer and engineer at National Electric Coil/Copper Industries from 1963 to 1980, as an industrial engineer at West Virginia Armature Co. from 1980 to 1981, and as a plant manager at Baker Mine Service from

1981 to 1985. (D.I. 1, Ex. A ¶ 47)

On December 3, 2012, Foster Wheeler removed the action to this court. (D.I. 1) Plaintiffs filed the pending Motion to Remand on December 18, 2012. (D.I. 13) On December 19, 2012, Plaintiffs filed Evidentiary Objections to affidavits of defense witnesses submitted by Foster Wheeler in support of removal.[1] (D.I. 16)

### III. LEGAL STANDARD

The federal officer removal statute, 28 U.S.C. § 1442(a)(1), provides, in pertinent part:

> (a) A civil action . . . commenced in State court against any of the following may be removed by them to district court of the United States for the district and division embracing the place where it is pending.
> (1) The United States or an agency thereof of any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office . . . .

28 U.S.C. § 1442(a)(1). The party removing an action to federal court bears the burden of proving that removal is appropriate.[2] *See Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990). In the Third Circuit, the provisions of the federal officer removal statute are to be "broadly construed." *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994). *See also Megill v. Worthington Pump, Inc.*, 1999 WL 191565, at *2 (D. Del. Mar. 26, 1999). The

---

[1] Specifically, Plaintiffs move to strike portions of the affidavits of J. Thomas Schroppe (D.I. 1, Ex. K) and Admiral Ben J. Lehman (*Id.*, Ex. L) and various related exhibits. (D.I. 16 at 1)

[2] The Third Circuit draws a distinction between the removal provisions of section 1441, which "'are to be strictly construed against removal and all doubts should be resolved in favor of remand,'" *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990) (quoting *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987)), and the provisions of the federal officer removal statute, which are to be "broadly construed." *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994). *See also Deuley v. Dyncorp Int'l, Inc.*, 588 F. Supp. 2d 539, 542 (D. Del. 2008) ("It is recognized that this provision [§ 1442(a)(1)] is not to be construed narrowly."); *Parlin v. Dyncorp Int'l, Inc.*, 579 F. Supp. 2d 629, 634 (D. Del. 2008) (explaining that Section 1442(a) is "liberally construed").

Supreme Court has explained that "the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) (citation omitted).

To establish federal officer removal jurisdiction under Section 1442(a)(1), a defendant must show the following:

> (1) it is a "person" within the meaning of the statute;
> (2) the plaintiff's claims are based upon the defendant's conduct "acting under" a federal office;
> (3) it raises a colorable federal defense; and
> (4) there is a causal nexus between the claims and the conduct performed under color of a federal office.

*Feidt v. Owens Corning Fiberglas Corp.*, 153 F.3d 124, 127 (3d Cir. 1998) (citing *Mesa v. California*, 489 U.S. 121, 129 (1989).

With respect to the first element of the statute, this court has held that "defendants, as corporations, are 'persons' within the meaning of [Section 1442(a)(1)]." *In re Asbestos Litig. (Seitz)*, 661 F. Supp. 2d 451, 454 (D. Del. 2009) (citing *Good v. Armstrong World Indus., Inc.*, 914 F. Supp. 1125, 1128 (E.D. Pa. 1996)). *See also Kirks v. GE*, 654 F. Supp. 2d 220, 223 (D. Del. 2009).

To satisfy the second element, the defendant "must demonstrate that a 'federal office' was the source of the specific act for which the contractor now faces suit." *In re Asbestos Litig. (Seitz)*, 661 F. Supp. 2d at 454 (citing *Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129, 138 (D. Mass. 2009)). "The second factor has been described as requiring 'a showing that the acts forming the basis of the state suit were performed pursuant to an officer's direct orders or comprehensive and detailed regulations.'" *Id.* (citing *Good*, 914 F. Supp. at 1128).

The third element "requires a moving defendant to demonstrate that there is a colorable

defense to a plaintiff's claims." *Id.* (citing *Megill*, 1999 WL 191565, at *3). The colorable defense asserted here is the federal common law government contractor defense. According to the Supreme Court, a federal contractor will not be liable for design defects in military equipment[3] under state tort laws when:

> (1) the United States approved reasonably precise specifications;
> (2) the equipment conformed to those specifications; and
> (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.[4]

*Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).

Although the *Boyle* decision applied the government contractor defense to a design defect products liability claim, federal courts have recognized the defense's applicability to state law failure-to-warn clams. *See, e.g., In re Asbestos Litig. (Seitz)*, 661 F. Supp. 2d at 454; *Kirks*, 654 F. Supp. 2d at 224-25; *Megill*, 1999 WL 191565, at *4.[5] "'Indeed, the determination of whether defendant has demonstrated a colorable defense under *Boyle* collapses into the analysis required for determining whether defendant has shown a causal connection between plaintiff's claims and

---

[3] In the Third Circuit, the government contractor defense is "available to all contractors who are 'compelled by a contract to perform an obligation for the United States,' even where a nonmilitary product is at issue." *Megill*, 1999 WL 191565, at *3 n.1 (quoting *Carley v. Wheeled Coach*, 991 F.2d 1117, 1120 (3d Cir. 1993)).

[4] "The first two of these conditions assure that . . . the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512-13 (1988).

[5] *See also Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003 (7th Cir. 1996) ("It is well established that the government contractor defense . . . may operate to defeat a state failure-to-warn claim." (citing *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 586 (9th Cir. 1996)); *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995); *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 629 (2d Cir. 1990).

the conduct performed under color of federal office.'" *In re Asbestos Litig. (Seitz)*, 661 F. Supp. 2d at 454-55 (quoting *Megill*, 1999 WL 191565, at *4).

The Supreme Court in *Boyle* held that the government contractor defense pre-empts state tort law when "the state-imposed duty of care that is the asserted basis of the contractor's liability . . . is precisely contrary to the duty imposed by the government contract." *Boyle*, 487 U.S. at 509. Thus, in actions, such as the present case, involving allegations of failure to warn of the dangers of asbestos, the removing defendant

> must show that the applicable federal contract includes warning requirements that significantly conflict with those that might be imposed by state law. Moreover, it seems clear to us[] that *Boyle's* requirement of government approval of "reasonably precise specifications" mandates that the federal duties be imposed upon the contractor. The contractor must show that whatever warnings accompanied a product resulted from a determination of a government official, . . . and thus that the government itself "dictated" the content of the warnings meant to accompany the product.

*In re Asbestos Litig. (Seitz)*, 661 F. Supp. 2d at 455 (quoting *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 630 (2d Cir. 1990)). "'A crucial element of both the *Boyle* decision and the removal requirements is missing if the contractor fails to establish a causal connection between the conduct being supervised by the [federal office] and the conduct deemed offensive in the plaintiff's complaint.'" *Id.* (alteration in original) (quoting *Megill*, 1999 WL 191565, at *4).

### IV. DISCUSSION

The dispute in this case turns on whether Foster Wheeler's evidence supporting the government contractor defense is sufficient to meet the requirements for removal under Section 1442(a)(1). Foster Wheeler contends that its affidavits and supporting materials demonstrate that the Navy exercised control over the manufactured products and that, consequently, the government contractor defense precludes state-law liability for defective product design and

failure to warn. (D.I. 20 at 2, 4, 5)

On the other hand, Plaintiffs claim that Foster Wheeler's evidence is "speculative and hearsay conjecture" that does not establish a colorable federal defense or satisfy the elements for removal. (D.I. 14 at 1, 3) In support of this contention, Plaintiffs point to a series of decisions that reject Section 1442(a)(1) removal after considering similar (and in some instances, the same) affidavits to those offered here.[6] (*Id.* at 2 n.1)

However, this court has previously noted in *Kirks v. GE*,

> there are decisions rejecting evidence such as that proffered by [the defendant], instead requiring a higher threshold of evidence to establish federal officer removal jurisdiction. For instance, in *Holdren v. Buffalo Pumps, Inc.*, the district court not only required the contractor to demonstrate that "the decision to warn must be the government's, not the contractor's," but that the decision also "reflect a federal interest incompatible with the important health and safety requirements of state law." While these considered opinions have merit, given that the provisions of the federal officer removal statute are to be construed broadly, and given that [the defendant] has produced evidence demonstrating a significant degree of control by a federal office over the warnings related to the dangers of asbestos, I respectfully reach a contrary conclusion.

*Kirks*, 654 F. Supp. 2d at 225-26 (citations omitted).

### A. Analysis of Colorable Federal Defense Standard

This court's ruling in *Kirks* illustrates the trend in this Circuit to broadly construe the federal officer removal statute. More recently, in *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d

---

[6] Specifically, Plaintiffs cite the following decisions: *Adams v. Armstrong Int'l, Inc.*, 2012 WL 76159 (S.D. Ill. Jan. 10, 2012); *Rinier v. A.W. Chesterton, Inc.*, 2010 WL 289194 (S.D. Ill. Jan. 19, 2010); *Stephens v. A.W. Chesterton, Inc.*, 2009 WL 3517560 (S.D. Ill. Oct. 22, 2009); *Prewett v. Goulds Pumps (IPG)*, 2009 WL 2959877 (W.D. Wash. Sept. 9, 2009); *Holdren*, 614 F. Supp. 2d 129; *Sether v. AGCO Corp.*, 2008 WL 1701172 (S.D. Ill. Mar. 28, 2008); *Barrett v. CLA-VAL Co.*, No. 07-7774 (C.D. Cal. Feb. 5, 2008); *Westmiller v. IMO Indus., Inc.*, 2005 WL 2850334 (W.D. Wash. Oct. 20, 2005); *Westbrook v. Asbestos Defendants (BHC)*, 2001 WL 902642 (N.D. Cal. July 31, 2001); *Nguyen v. Allied Signal, Inc.*, 1998 WL 690854 (N.D. Cal. Sept. 29, 1998); *Arness v. Boeing N. Am., Inc.*, 997 F. Supp. 1268 (C.D. Cal. 1998); *Overly v. Raybestos-Manhattan*, 1996 WL 532150 (N.D. Cal. Sept. 9, 1996).

770 (E.D. Pa. 2010), District Judge Robreno (presiding in MDL No. 875 -- the multidistrict asbestos products liability litigation[7]) conducted a comprehensive analysis of the law and the conflicting precedent relative to federal officer removal jurisdiction in asbestos actions. Judge Robreno observed that the split in authority "boils down to an argument over what a defendant must proffer to defeat a plaintiff's motion for remand." *Hagen*, 739 F. Supp. 2d at 777. The divergent views are a consequence of two clashing objectives a court must consider in deciding a plaintiff's motion to remand: "(1) the Supreme Court's mandate to broadly construe a defendant's removal under Section 1442(a)(1); and (2) the bounds of federal subject matter jurisdiction imposed by both the Constitution and the removal statute itself." *Id.* at 778.

On one side of the split, "the colorable defense standard is not an onerous one to satisfy." *Id.* at 780. For example, some courts require only that a colorable defense be plausible in order to meet the requirements for removal under Section 1442(a)(1). *Id.* "Yet other courts . . . [,] albeit not explicitly -- apply a heightened standard at the remand stage that requires courts to 'carefully weigh the plausibility of the proffered defense.'" *Id.* (quoting *Holdren*, 614 F. Supp. 2d at 140).[8]

Judge Robreno rejected the latter approach, citing the Supreme Court's mandate to broadly construe the federal officer's right of removal, *id.* at 781, and ultimately held that "a defendant is entitled to removal under Section 1442(a)(1) where the defendant identifies facts

---

[7] "For approximately two decades, all asbestos-related personal injury and wrongful death actions were consolidated in the Eastern District of Pennsylvania as MDL No. 875. Judge Eduardo Robreno has presided over MDL No. 875 since 2008." *Joyner v. A.C. & R. Insulation Co.*, 2013 WL 877125, at *4 n.6 (D. Md. Mar. 7, 2013) (citing *In re Asbestos Prods. Liab. Litig. (No. VI)*, 830 F. Supp. 2d 1377, 1377-78 (J.P.M.L. 2011)).

[8] In *Holdren*, the court granted the plaintiffs' motion to remand because the evidence presented by the defendants purportedly did not show "that the Navy ever exercised its final authority in any fashion that either expressly barred or broadly preempted the inclusion of asbestos warnings." *Holdren*, 614 F. Supp. 2d at 139.

which, viewed in the light most favorable to the defendant, entitle him or her to a complete defense." *Id.* at 778. *See also Vedros v. Northrop Grumman Shipbuilding, Inc.*, 2012 WL 3155180, at *5 (E.D. Pa. Aug. 2, 2012).

The standard articulated in *Hagen* has been adopted by federal district courts in a number of jurisdictions.[9] *See, e.g., Joyner v. A.C. & R. Insulation Co.*, 2013 WL 877125, at *5 (D. Md. Mar. 7, 2013) ("After reviewing the conflicting cases, this court finds the analysis in *Hagen* cogent and consistent with the general removal standard."); *Williams v. Aetna Life Ins. Co.*, 2013 WL 593505, at *5 (S.D. Ala. Jan. 30, 2013); *Shepherd v. Air & Liquid Sys. Corp.*, 2012 WL 5874781, at *3 (D.R.I. Nov. 20, 2012) (finding *Hagen* "persuasive and reasonable since it presents a standard which requires a removing defendant to show that its federal contractor defense is factually supported, i.e., 'colorable,' but does not go so far as to require a defendant to prove its defense in order to secure removal"); *Thompson v. Crane Co.*, 2012 WL 1344453, at *19-20 (D. Haw. Apr. 17, 2012) ("*Hagen* is well reasoned, and this Court finds it to be particularly persuasive because it comes from the MDL Court, which has dealt with thousands of similar cases from across the country."); *Albrecht v. A.O. Smith Water Prods.*, 2011 WL 5109532, at *4 (S.D.N.Y. Oct. 21, 2011).

Pursuant to *Kirks* and *Hagen*, the Plaintiffs' Motion to Remand should be denied if Foster Wheeler "identifies facts which, viewed in the light most favorable to the defendant, would establish a complete defense at trial." *Hagen*, 739 F. Supp. 2d at 783. As discussed below, Foster Wheeler has satisfied this standard and each element of federal officer removal jurisdiction.

---

[9] Notably, when the Judicial Panel on Multidistrict Litigation recently discontinued the transfer of new asbestos cases to MDL No. 875, it contemplated that district courts presiding over future asbestos cases "will almost certainly find useful guidance in the many substantive and thoughtful rulings that have been issued during the lengthy course of the multidistrict proceedings," and specifically referenced the *Hagen* decision, among others, relative to federal officer removal. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 830 F. Supp. 2d 1377, 1379 & n.5 (J.P.M.L. 2011).

### B. Analysis of Federal Officer Removal Jurisdiction

In order to establish removal jurisdiction under Section 1442(a)(1), Foster Wheeler must show the following:

(1) it is a "person" within the meaning of the statute;
(2) the plaintiff's claims are based upon the defendant's conduct "acting under" a federal office;
(3) it raises a colorable federal defense; and
(4) there is a causal nexus between the claims and the conduct performed under color of a federal office.

*Feidt*, 153 F.3d at 127 (citing *Mesa*, 489 U.S. at 129).

There is no dispute that Foster Wheeler, as a corporation, is a "person" within the meaning of the statute. *See Kirks*, 654 F. Supp. 2d at 223.

With respect to the second element, Foster Wheeler has shown that Plaintiffs' design defect and failure-to-warn claims are based upon Foster Wheeler's conduct "acting under" a federal office. Specifically, Foster Wheeler has submitted three affidavits to demonstrate "that the acts forming the basis of [Plaintiffs' claims] were performed pursuant to . . . direct orders or comprehensive and detailed regulations" of the office of the Navy and its officers. *See In re Asbestos Litig. (Seitz)*, 661 F. Supp. 2d at 454.

Foster Wheeler's first affidavit is the declaration of J. Thomas Schroppe ("Mr. Schroppe"). (D.I. 1, Ex. K) Mr. Schroppe is a former Foster Wheeler employee who began his career as a proposal engineer in the company's marine department, and ultimately became President of Foster Wheeler. (*Id.*, Ex. K ¶ 1) Mr. Schroppe states that, over the course of his employment, he became "personally familiar with the degree of supervision and control exercised by the Navy and its agencies in procurement contracts with Foster Wheeler." (*Id.*, Ex. K ¶ 2) According to Mr. Schroppe, Foster Wheeler was required to comply strictly with detailed ship specifications and military specifications for each of its individual products. (*Id.*, Ex. K ¶ 5,

6) These specifications "cover[ed] all specific components of the boiler[s]" that Foster Wheeler built for the Navy. (*Id.*, Ex. K ¶ 6)

Mr. Schroppe further states that Foster Wheeler was obligated to provide technical manuals with its products, over which "[t]he Navy exercised intense direction and control." (*Id.*, Ex. K ¶ 21) Specifically, Mr. Schroppe explains:

> The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval boilers and economizers only to the extent directed by the Navy.
> Furthermore, the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy. Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy.

(*Id.*, Ex. K ¶¶ 21-22)

Foster Wheeler also filed the affidavit of Admiral Ben J. Lehman ("Admiral Lehman"), a retired Rear Admiral of the United States Navy. (*Id.*, Ex. L ¶ 1) Admiral Lehman describes the level of control that the Navy asserted over all aspects of the equipment supplied to the Navy pursuant to government contracts. (*Id.*, Ex. L ¶ 2) With respect to product design and manufacture, Admiral Lehman states that "the military specifications for boilers . . . were drafted, approved, and maintained by the U.S. Navy, . . . to encompass all aspects of shipboard equipment, including the material requirements." (*Id.*, Ex. L ¶ 6) Admiral Lehman avers that Foster Wheeler was required to comply with these specifications "in every detail," and inspectors affiliated with the Navy "would report . . . any violations of, or failures to comply with specifications, . . . and not authorize shipment." (*Id.*, Ex. L ¶ 5)

Admiral Lehman further states that

> [m]ilitary specifications governed every significant characteristic of the equipment used on U.S. Navy ships, including the instructions and warnings. Drawings for nameplates, the texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the U.S. Navy. This control included the decision of which warnings should or should not be included.

(*Id.*, Ex. L ¶ 10) According to Admiral Lehman,

> [t]he U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel.[10]

(*Id.*, Ex. L ¶ 14)

Foster Wheeler also submitted the affidavit of Lawrence Stilwell Betts, MD, PhD, CIH, FACOEM ("Dr. Betts") to support the proposition that the Navy possessed state of the art knowledge on the dangers of asbestos. (D.I. 20, Ex. 6) Dr. Betts is a medical doctor and retired U.S. Navy Captain. (*Id.*, Ex. 6 ¶ 1) In his affidavit, Dr. Betts states that,

> [d]uring the period from the early 1920s to the late 1960s, there was nothing about the hazards associated with the use of asbestos containing-products on a marine steam boiler on United States Navy ships known by a boiler manufacturer, like Foster Wheeler, that were not known by the United States and the United States Navy.

(*Id.*, Ex. 6 ¶ 31) According to Dr. Betts, "[t]he information possessed by the Navy with respect to the specification and use of asbestos, and the health hazards associated with its use aboard Navy vessels, . . . far exceeded any information that possibly could have been provided by a boiler manufacturer like Foster Wheeler." (*Id.*, Ex. 6 ¶ 31) Dr. Betts further avers that "[t]he

---

[10] This court in *Kirks* relied upon a similar affidavit of Admiral Lehman, among others, to find removal appropriate for failure-to-warn claims relating to asbestos use aboard Navy ships. *See Kirks*, 654 F. Supp. 2d at 223-24, 225.

11

Navy's use of asbestos aboard ships and on boilers, if any, was not by chance or based on any requirements of Foster Wheeler. The use of asbestos was based upon military necessity."[11] (*Id.*, Ex. 6 ¶ 5)

Based on the above affidavits, I find that Foster Wheeler has satisfied its burden to prove that Plaintiffs' design defect and failure-to-warn claims are based upon Foster Wheeler's conduct "acting under" the office of the Navy and its officers.

With respect to the third element of removal jurisdiction under Section 1442(a)(1), Foster Wheeler has raised a colorable federal defense to Plaintiffs' claims, namely, the government contractor defense. The government contractor defense displaces state tort law where:

> (1) the United States approved reasonably precise specifications;
> (2) the equipment conformed to those specifications; and
> (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle*, 487 U.S. at 512. "However, because 'design defect and failure to warn claims differ practically as well as theoretically,' courts have required the government approval to 'transcend rubber stamping' for the defense to shield a government contractor from failure to warn liability." *Hagen*, 739 F. Supp. 2d at 783 (quoting *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1156, 1157 (6th Cir. 1995)).

The government contractor defense inquiry "is undertaken whilst viewing the facts in the light most favorable to Defendants, and does not address the merits of the defense." *Id.* at 783-84.

The evidence submitted by Foster Wheeler is adequate on its face to make a plausible

---

[11] This court in *Kirks* relied upon a similar affidavit of Dr. Betts, (among others, *see supra* note 10), in determining that the defendant had established federal officer removal jurisdiction. *See Kirks*, 654 F. Supp. 2d at 224, 225.

showing that the Navy "approved reasonably precise specifications," or exercised direction and control, over the design, manufacture, and accompanying safety manuals and labeling of the products supplied by Foster Wheeler. For example, the affidavits indicate that Foster Wheeler's boilers "were designed and manufactured in accordance with detailed specifications written, approved, and issued by the U.S. Navy." (D.I. 1, Ex. L ¶ 3) Furthermore, Foster Wheeler would not be permitted to include with its products "any type of warning or caution statement." (*Id.*, Ex. K ¶ 22) This is supported by the assertion that the specifications "governed every significant characteristic of the equipment used on U.S. Navy ships, including the instructions and warnings." (*Id.*, Ex. L ¶ 10) According to Foster Wheeler's affidavits, the Navy controlled "the decision of which warnings should or should not be included." (*Id.*, Ex. L ¶ 10) Therefore, the evidence is sufficient to plausibly show that the Navy was responsible for the product design and lack of warnings.

The affidavits are likewise adequate to show that Foster Wheeler's products conformed to the Navy's specifications. With respect to design and manufacture, Foster Wheeler's products would not be accepted unless the equipment complied with Navy specifications "in every detail." (*Id.*, Ex. L ¶ 5) Similarly, Foster Wheeler conformed to the Navy's specifications by failing to include warnings that "would not be permitted[] under the specifications." (*Id.*, Ex. K ¶ 22)

Foster Wheeler's evidence also satisfies the third element of the government contractor defense. Notably, as the language of the third prong suggests, a contractor is not required to warn the United States of hazards of which the United States was already aware. Dr. Betts' affidavit addresses this point directly, by stating that "[t]here was no information concerning any asbestos-containing hazard or danger posed by any asbestos-containing product applied to any marine boiler on a United States Navy ship known to a boiler manufacturer, like Foster Wheeler, that

was not known to the United States and the United States Navy." (D.I. 20, Ex. 6 ¶ 32) This evidence constitutes a plausible showing that the Navy was already familiar with the dangers of asbestos, such that Foster Wheeler was not obligated to apprise the Navy of those risks. Thus, Foster Wheeler has satisfied the third element of the government contractor defense and, consequently, has established a colorable federal defense under Section 1442(a)(1).

With respect to the final element of federal officer removal jurisdiction, Foster Wheeler has shown a causal nexus between Plaintiffs' claims and Foster Wheeler's conduct performed under color of a federal office. The design defect claim arises directly out of the Navy's specifications, which allegedly required Foster Wheeler to use asbestos in the products it manufactured and designed. The failure-to-warn claim arises directly out of the Navy's alleged involvement in the process of determining what warnings could be included with, or placed upon, products manufactured by Foster Wheeler. Consequently, a causal nexus exists because Foster Wheeler's liability arises from its official duties, performed in accordance with government contracts. Therefore, Foster Wheeler has established federal officer removal jurisdiction.

This conclusion is supported by similar decisions, based upon one or more of these affidavits, that the federal officer removal statute has been satisfied where Navy regulations required the use of asbestos and mandated what warnings were required concerning asbestos.[12] *See, e.g., Shepherd v. Air & Liquid Sys. Corp.*, 2012 WL 5874781 (finding that Foster Wheeler had established federal officer removal jurisdiction based, in part, on affidavits from Mr.

---

[12] While this court's prior decisions in *Seitz* and *Megill* are contrary to the above conclusion, those cases were based on a different record. Notably, evidence such as that presented in the three affidavits filed here was not presented by the defendants in *Seitz* and *Megill*. *See In re Asbestos Litig. (Seitz)*, 661 F. Supp. 2d at 455; *Megill*, 1999 WL 191565, at *4.

Schroppe, Admiral Lehman, and Dr. Betts); *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770 (same); *Kirks v. GE*, 654 F. Supp. 2d 220 (relying, in part, on the affidavits of Admiral Lehman and Dr. Betts to find removal appropriate for failure-to-warn claims related to asbestos use aboard Navy ships).

### C. Plaintiffs' Evidentiary Objections

Given that Foster Wheeler has satisfied the removal requirements under Section 1442(a)(1), consideration of the Plaintiffs' Evidentiary Objections (D.I. 16) is not warranted at this early stage of the proceeding.[13] The Supreme Court has

> rejected a "narrow, grudging interpretation" of the [federal officer removal] statute, recognizing that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *We therefore do not require the officer virtually to "win his case before he can have it removed."*

*Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (emphasis added) (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)). Judge Robreno expanded on this point in *Hagen*, explaining that

> the court is not called upon at this preliminary stage to pierce the pleadings or dissect the facts stated. Nor is it the Court's function at this stage to determine credibility, weigh the quantum of evidence or discredit the source of the defense. It is the sufficiency of the facts stated -- not the weight of the proof presented -- that matters. For policy reasons, Congress has erected a road to federal court for litigants who can invoke a federal defense. It is not the Court's role to impose judicially created tolls on those who seek to travel on it.[14]

---

[13] Presumably, the merits of Foster Wheeler's defense will be tested on a motion for summary judgment or at trial. By allowing Foster Wheeler's defense to be resolved in this forum, the court adheres to the clear mandate of Section 1442(a)(1). *See Hagen*, 739 F. Supp. 2d at 783 n.13.

[14] *See also Albrecht*, 2011 WL 5109532, at *4 ("Although the evidence provided by [the defendant] may ultimately prove insufficient to support its defense on the merits, the Court finds that Plaintiffs overestimate the demands of § 1442 at this stage of the proceedings. To establish jurisdiction under § 1442, [the defendant] need not prove its defense but need only show that it has the underpinnings of a valid federal defense." (citing *Hagen*, 739 F. Supp. 2d at 782-83)).

*Hagen*, 739 F. Supp. 2d at 782-83. Consequently, the court should not consider Plaintiffs' Evidentiary Objections at this juncture.

## V. CONCLUSION

For the foregoing reasons, I recommend that the court deny the Plaintiffs' Motion to Remand.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. Appx. 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order in Non-Pro Se Matters for Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the court's website, www.ded.uscourts.gov.

Dated: September 26, 2013

Sherry R. Fallon
United States Magistrate Judge